(A.R.D. 138)

RUSTAM K. KERMANI CO. *v.* UNITED STATES

Entry No. 74534, etc.

## Second Division, Appellate Term

(Decided December 14, 1961)

*John D. Rode* for the appellant.

*William H. Orrick, Jr.*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for review of a decision and judgment sustaining the appraised values of certain imported rugs. Nine appeals for reappraisement, covering exportations from Iran during a period between June 1951, and August 1957, are involved and have been consolidated for purposes of trial.

The rugs in question were manufactured in the city of Kerman, Iran, and are known as Kerman rugs. The invoices embrace three main qualities identified as 40/80, 37/75 or 75, and 35/70, which designations indicate the number of stitches to the square inch. Invoice quotations were in Iranian rials per piece or per zar,[1] certain charges included, and the rugs were entered, as invoiced, less those charges claimed to be nondutiable.

The details of appraisement of the various items in the respective appeals for reappraisement are as follows:

| Reap. No. | Number of bales | Number of rugs | Quality | Appraised per sq. ft. |
|---|---|---|---|---|
| 269492–A | 14 | 84 | 35/70 | $2. 20 |
| | | | 40/80 | $3. 50 |
| 269493–A | 18 | 47 | 75 ⎫ 40/80 ⎬ 35/70 ⎭ | $2. 80 |
| 269494–A | 25 | 86 | 75 ⎫ 40/80 ⎬ 35/70 ⎭ | $2. 50 |
| 269495–A | 15 | 91 | 75 ⎫ 40/80 ⎬ 35/70 ⎭ | $2. 90 |
| 269496–A | 27 | 91 | 75 [2] ⎫ 40/80 ⎭ | $2. 47 |
| | | | 35/70 | $1. 84 |
| 269715–A | 30 | 97 | 37/75 ⎫ 40/80 ⎭ | $2. 47 |
| | | | 35/70 | $1. 84 |
| 294947–A | 26 | 134 | 37/75 ⎫ 40/80 ⎭ | Invoice units, plus 15%, plus dutiable charges |
| R58/4874 | 15 | 89 | 40/80 ⎫ 75 ⎭ | $2. 80 |
| | | | 35/70 | $1. 50 |
| R58/18353 | 30 | 206 | 40/80 ⎫ 37/75 ⎭ | Invoice units, plus 10%, plus dutiable charges |

[1] An Iranian unit of measurement, approximately equivalent to 7 feet.

[2] It seems clear from the official papers and the testimony of the examiner that this quality was, in fact, returned as above, despite a notation that quality 75 and quality 35/70 were appraised at $1.84.

The parties have stipulated that there was no foreign value for such or similar merchandise and that, in all instances, appraisements were made on the basis of export value of similar merchandise within the definition thereof in section 402 (d) of the Tariff Act of 1930. It is the contention of appellant, plaintiff below, that export value of such or similar merchandise is properly represented by the entered values and that the appraised values were erroneous.

Export value is defined in said section 402 (d) as follows:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

At the trial, appellant introduced into evidence the testimony of Rustam K. Kermani, owner of the importing company; an affidavit of one Khosrow Sorooshian, elsewhere referred to as Serushian, the shipper of the merchandise at bar (plaintiff's collective exhibit 1); and the testimony of the two customs examiners who advisorily appraised the subject rugs.

One of said examiners also testified on behalf of appellee, as did George A. Tadross, an importer of Oriental rugs from Iran since 1930. Certain correspondence, identified by Kermani as an unsigned letter to him from his cousin Serushian, was introduced into evidence as defendant's collective exhibit B; a list, itemizing, among others, nine rugs imported by appellant and consigned to said George A. Tadross was received in evidence as defendant's exhibit C.

At the outset, it may be observed that much of the testimony of Kermani lacks evidentiary value, in the light of his statement that he had last visited Iran in 1939, and, while he testified on direct examination that, during the period covered by the instant importations, Kerman rugs of superior quality were offered to him at higher prices by other manufacturers than those who produced his own, he admitted, on cross-examination, that he had no knowledge of how manufacturers of similar rugs offered them for exportation to the United States, or of whether any of the manufacturers from whom he obtained rugs sold to others in the United States.

His testimony does, however, establish that he employed his cousin as his agent in Iran to negotiate the purchase of rugs from the individual weavers whose names are set forth on the invoices as the manufacturers and sellers. In that capacity, Serushian sometimes provided the designs and/or the wool and supervised the weaving

processes. The witness stated that the services of Serushian are exclusively his and that Serushian neither ships, sells, nor exports to any other American importer; nor does his company import rugs through any other source. It also appears that most of the rugs shipped to appellant were specially woven for its account and contain its trademark, consisting of a small crown and the initials RKK.

We further consider this witness, who had been importing Kerman rugs since 1927, to be qualified to state, as he did, that the invoice quality designations are general terms which embrace rugs of different grades and prices; and that Kermans are hand-crafted rugs, individually differing in color, design, general quality, and appearance.

Serushian's affidavit, plaintiff's collective exhibit 1, purports to supplement Kermani's testimony. It recites his background of 45 years' experience in the different phases of rug production in the principal markets of Iran; his business relationship to the Rustam K. Kermani Co.; his familiarity with the merchandise covered by the shipments here in issue; the nature and quality of the rugs involved; the extent of his services in connection with the purchase and shipment of the rugs; and further states:

* * * that the prices paid by him to the weavers and sellers of the rugs, as buying agent for Rustam K. Kermani Co. were the prices at which said weavers and sellers offered such rugs to any and all purchasers in Kerman in the usual and regular course of trade, whether for home consumption in Iran or for exportation to the United States; that said prices also were the prices which were prevailing at the time of exportation of the above listed shipments; that the said rugs were purchased on a square foot basis, the price being the same regardless of the quantity purchased; that the price per square foot varied according to the quality of the wool in each individual rug, its color, design and workmanship; that at the times he purchased said rugs for and on behalf of Rustam K. Kermani Co. as well as at the time of exportation of said rugs, he knows that other Kerman rugs, of similar 40/80, 35/70 and 37/75 quality and of like colors, designs, and workmanship were being offered for sale and sold in Kerman to all purchasers both for home consumption and for exportation to the United States at the same prices as stated on the above listed invoices; that his familiarity with market conditions in Kerman is based upon his lifetime of experience in the rug business, his personal observations, talks and dealings with weavers, sellers, buyers and suppliers, and his personal witnessing of the purchase and sale of Kerman rugs in the Kerman market by many other buyers both for home consumption and for exportation to the United States and that he knows the market value on or about the date of exportation of the rugs covered by the above listed shipments was the same as the price stated on said invoices for the respective rugs.

The evidence given by the two customs examiners related in the main to the mechanics of their respective recommendations for appraisement. Examiner Kahn's findings were predicated upon the opinion, derived from inspection of representative bales of rugs, that

the rugs in issue were manufactured solely for the account of the importer, and, especially by reason of the fact that its insignia was woven into the rugs, such merchandise was not offered to others for exportation to the United States. Consequently, he considered similar merchandise imported by some six other American importers of Kerman rugs. He further believed that neither the fact that there were different grades, nor the fact that the invoice unit prices varied within each grade, necessarily indicated that the rugs were of different qualities.

Examiner Stubbe stated that, in some cases, he accepted the different invoiced unit prices, but advanced each one a flat percentage; in others, he found separate values for the general qualities.

For reasons which will develop, *infra*, no useful purpose is here served in reviewing the proof introduced on the part of the defendant below.

The trial court held, in substance, that the evidence furnished by the plaintiff below was insufficient to overcome the presumption of correctness attaching to the appraised values. This conclusion derived from a finding that plaintiff's collective exhibit 1 lacked evidentiary facts to support its statements of ultimate fact and that the testimony of Kermani was likewise without probative value to establish the invoiced prices as the prices at which the rugs at bar "were freely offered for sale or sold in Iran to all purchasers for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade."

We are of opinion that the trial court's decision constitutes a sound evaluation of the instant record, in the light of controlling principles of law. *Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495; *Kobe Import Co.* v. *United States*, 42 C.C.P.A. (Customs) 194, C.A.D. 593; *United States* v. *Fisher Scientific Co.* and *Fisher Scientific Co.* v. *United States*, 44 C.C.P.A. (Customs) 122, C.A.D. 648.

The burden which rests upon a party who seeks to upset the presumptively correct value returned by the appraiser has been set forth with clarity in the oft-quoted case of *Brooks Paper Company* v. *United States*, *supra*, as follows:

By statutory provision[1] Congress has directed that (1) the value found by the appraiser shall be presumed to be the value of the merchandise and (2) the burden shall rest upon the party who challenges its correctness to prove otherwise.

To sustain his burden of proof, and overcome this statutory presumption, it is incumbent upon appellant, the party challenging the value found by the appraiser in the first instance, to prove the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. To do

---

[1] This provision appeared in section 501 of the Tariff Act of 1930, 19 U.S.C. § 1501, until June 25, 1948, when it was removed from that section to section 2633, Title 28, U.S.C.

this, that party must meet every material issue involved in the case, and if he fails to do so the value fixed by the appraiser remains in full force and effect. *United States* v. *Gane and Ingram, Inc.*, 24 C.C.P.A. (Customs) 1, T.D. 48264, citing *United States* v. *T. D. Downing Co.* (*George H. Sweetnam, Inc.*), 20 C.C.P.A. (Customs) 251, T.D. 46057. It is clear, from a reading of section 402 (c) and (d), *supra*, that in order to prove foreign value or export value as a basis for a valid reappraisement, *the appellant must establish, inter alia, the usual wholesale quantities* in which such or similar merchandise involved was freely offered for sale to all purchasers in the principal markets of the country from which exported, etc.

* * * If appellant has failed to establish the usual wholesale quantities, then, in accordance with the foregoing, it seems clear that he has failed to meet his burden of proof, and the valuation set by the appraiser must stand. * * * [Italics quoted.]

The sole evidence bearing upon the issue of usual wholesale quantities in the *Brooks* case was a statement in an affidavit emanating from the foreign shipper that "the great majority of sales of matrix board to purchasers other than consumers [or "for export to the United States"] were in quantities of 15.000 square meters or more." The court construed this statement as one of ultimate fact—a conclusion of fact reasoned from primary facts—which, standing alone and unsupported by the evidentiary facts from which the conclusion was drawn, was insufficient to establish usual wholesale quantities.

The affidavit of Serushian, in the instant case, suffers from a similar omission of evidentiary facts to support his conclusions as to the material elements entering into the fabric of export value. He states that the invoice prices were the prices at which weavers and sellers offered such and similar rugs to all purchasers in Kerman, in the regular course of trade for home consumption or for exportation to the United States, and that the price per square foot was the same, regardless of quantity, but he leaves unstated the facts upon which these conclusions were based. Notwithstanding that he has personally witnessed the sale of Kerman rugs in the Kerman market to many other purchasers, his statements are not corroborated by evidence of such sales, of the prices at which they were made, of the limitations, if any, of their offer, or of the similarity of the rugs with those at bar. Nor, indeed, is there any indication that the sales to which he refers are sales in wholesale quantities. Consequently, we find plaintiff's collective exhibit 1 to be wholly deficient as substantive proof of the export value of such or similar rugs.

As we have heretofore observed, the testimony of the witness Kermani is also lacking in probative value. By his own admissions, he negatived his competency to speak of conditions in the rug market of Iran, or of the manner in which such or similar rugs were offered for sale for exportation to the United States during the period covered

by these importations. And since it affirmatively appears that the rugs included in the instant shipments were manufactured solely for the account of appellant, such rugs could not have been freely offered to all purchasers, within the contemplation of section 402(d), *supra.*

Counsel for the appellant points to the apparent inconsistency of the appraisements—the appraisement of different grades within each quality at the same value; the appraisement of all three qualities at the same values; the appraisement of quality 37/75, in some instances, at the same value as quality 40/80 and, in other instances, at the value of quality 35/70; the acceptance of the basic invoice prices, plus a flat percentage increase in certain instances; and the alleged unlikelihood of there being similar rugs to support each finding, as establishing that the appraised values were erroneous. It would seem, however, that this argument overlooks the fact that the nine shipments here involved embrace a span of upwards of 6 years. While the witness Kermani testified that prices remained the same between the date of purchase and the date of exportation of each shipment, the record does not establish whether or not the market remained constant from one date of exportation to the next.

We fail to see anything inherently erroneous in these appraisements or any material evidence of record to establish that they were incorrect. But even were we to hold to the contrary, it would not avail this importer, for it should then have sustained only part of the statutory burden which it has shouldered. There remained the necessity of establishing some other value by probative evidence, and this we have found to be wholly lacking. As stated in *Kobe Import Co.* v. *United States, supra*:

> However erroneous the appraiser's action may have been in valuing the merchandise, it was incumbent upon appellant seeking to prove the correctness of a different statutory export value to meet every material issue in the case, and hence establish every element of that value in strict compliance with the dictates of section 402(d), *supra.* Failing to sustain this burden of proof, the value fixed by the appraiser remains in full force and effect.

Accordingly, we are in agreement with the trial court that the statutory presumption of correctness of the appraised values in this case has not been overcome.

We, therefore, find the following facts:

1. That the merchandise covered by these consolidated appeals for reappraisement consists of rugs of various qualities, exported from Iran at various times from June 1951 through August 1957.

2. That said rugs were entered at the invoice prices, less certain nondutiable charges.

3. That said rugs were appraised at values in excess of the entered values, on the basis of the export values of similar merchandise.

4. That neither such nor similar merchandise was freely offered for sale for home consumption in Iran.

5. That such rugs were specially manufactured for the importer herein and were not freely offered for sale for exportation to the United States to other purchasers.

6. That there is no probative evidence to establish that similar rugs were freely offered for sale for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, at any different values than those returned by the appraiser.

The court, therefore, concludes:

1. That there was no foreign value for such or similar merchandise.

2. That there was no export value for such merchandise.

3. That export value, as defined in section 402(d) of the Tariff Act of 1930, insofar as it relates to the value of similar merchandise, is the proper basis of value to be applied to the subject rugs.

4. That the presumptively correct values returned by the appraiser have not been overcome; and, therefore,

5. That the judgment of the trial court so holding should be affirmed.